GOODWIN & CORT *vs.* THE BALTIMORE AND OHIO RAILROAD
COMPANY.

Common carriers are liable in two capacities; one as insurers and one as ware-
housemen. If an injury happens to goods, from any cause except the act of
God or the public enemies, while the carriers are insurers, an action lies against
them, by the owners, for damages, and is made out without further inquiry.

But if the injury happens after the goods are claimed to have been delivered,
the question arises whether the defendants' liability as common carriers, in
all its rigor, had, under the circumstances, ceased; and if so, whether the
defendants had exercised that care of the property required of them as
warehousemen.

Carriers are bound to deliver goods transported by them. Delivery is not
effected by placing the property in a position where it cannot be obtained by
the owner or consignee.

A quantity of sheet-iron, consigned to the plaintiffs at New York, and trans-
ported by the defendants, was unloaded upon the wharf, in New York. The
plaintiffs received notice of the arrival of the ship in which the iron was
brought, and received a small portion of the iron uninjured. On sending
for the remainder, they were unable to get it until some days after it was
placed upon the pier, by reason of other freight having been so placed that
the iron could not be reached. While it was in this position, it was damaged
by rain. *Held* that the defendants were bound to deliver the goods at the
usual place, and to deliver them in a conveniently reasonable method for
their removal; and that the plaintiffs were bound to exercise reasonable dil-
igence in removing them.

That it was for the jury to determine whether a reasonable time had elapsed
after notice of the arrival of the iron, for the plaintiffs to remove it, before it
was injured by the rain.

That after the expiration of a reasonable time for the removal of the goods,
the liability of the defendants as insurers ceased, and their duty or liability
became that of warehousemen, which required that they should exercise
over the property, and for its protection, ordinary care and diligence.

That the burden of proof was upon the plaintiffs, to show that the defendants
did not use such care and diligence; and if the jury found that negligence
was proved, the defendants were liable, even though their duty as common
carriers was ended.

And the jury having found a verdict for the plaintiffs; *Held* that it was sus-
tained by the evidence; and the judgment entered thereon was affirmed.

APPEAL by the defendant from a judgment entered
upon the verdict of a jury, and from an order denying
a motion for a new trial.

The action was brought against the defendants as common carriers, to recover damages resulting to the plaintiffs through the negligence of the defendants, whereby a lot of sheet-iron consigned to the plaintiffs became wet and rusted before it was delivered to them, and while it was on the pier, (No. 13, N. Y. city,) where it had been placed by the defendants from their vessel while she was discharging her cargo, in September, 1865; and also for the recovery of $29.54, the value of three bundles of iron, admitted to have been lost by the defendants.

The action was tried before Justice CARDOZO and a jury. The facts appearing upon the trial, as claimed by the plaintiffs, were as follows: The plaintiffs are importers and dealers in metals at No. 245 Water street, N. Y. city. In August, 1865, three several lots of sheet-iron, amounting to 650 bundles, were delivered to the defendants at Wheeling, Va., to be transported to the city of New York, and there to be delivered to the plaintiffs, to whom the iron was consigned. The iron was carried from Wheeling to Baltimore by rail, from whence it was transported to New York city by steamships belonging to the defendants. 559 bundles of the iron were shipped on board the steamship *Carrol*, which arrived at Pier No. 13, New York, September 5th, where she lay about a week, discharging her cargo, and taking in another. The rest of the iron was shipped on the *Alleghany*, which arrived about six or eight days after the *Carrol*. Three bundles of the iron were lost. Eleven bundles were delivered by mistake to J. Dickinson & Co., and about three weeks afterwards received by the plaintiffs, while about two-thirds of the entire shipments of iron became rusted and damaged in consequence of becoming wet by a rain storm, while lying upon the pier, before the plaintiffs had an opportunity of taking the same away. Upon receiving notice of the arrival of the *Carrol*, September 5th, the plaintiffs immediately sent their cartman (Beekman) to the ship to get the iron. On that day

Goodwin *v.* Baltimore and Ohio Railroad Company.

the cartman did not get any; there being none out of the vessel. The plaintiffs continued to send him, and finally he got a small portion of the iron on the 6th or 7th, about twenty bundles, which was not damaged. The plaintiffs continued to send their cartman daily, two or three times a day, with a double truck and two single carts, to get the rest of the iron, but he was unable to get any more until about the 11th of September, owing to the fact that the remaining portion of the iron, when discharged from the vessel, was placed at the extreme end of the pier, and the entire width of the pier was covered with hogsheads of tobacco, discharged from the *Carrol*, and which, as the plaintiffs claimed, completely blocked the passage-way between the iron and the head of the pier, and rendered it impossible for carts to get to the iron lying at the other end of the pier.

The facts in respect to the landing of the iron were claimed to be as follows, viz: The small portion which was taken away by the plaintiffs' cartman on the 6th or 7th of September, was placed opposite the ship, pretty well up the dock, towards the bulkhead. The rest of the iron, being the greater portion, was placed at the extreme end of the pier, touching the string-piece, towards the river. In front of this iron, that is, between the street and the outer end of the pier, the defendants' agents placed a large number of hogsheads of tobacco which were taken from off the *Carrol* while she was discharging her cargo, which hogsheads were so placed as to extend across the width of the pier, about four tiers back. This obstruction continued for several days, rendering it impossible for a cartman to reach the iron at the end of the pier with his cart, until the 10th or 11th of September, when a passage-way was made for carts by rolling away some of the hogsheads of tobacco; and one of the defendants' agents went to the plaintiffs' store and notified them of the fact, and that they could get the iron. Their cartman removed it to their

Goodwin *v.* Baltimore and Ohio Railroad Company.

store, on the 10th or 11th of September. While the iron thus lay on the pier, a heavy rain came on and wet the iron, which caused it to rust, and greatly damaged it. The iron was placed at the lower end of the pier, where the water which made upon the dock ran down into the iron; and although the defendants' agents placed thin boards under the iron, and covered it with tarpaulins before the rain, yet the covering was insufficient to keep it dry—it was only partly covered, and the dunnage, or thin pieces of boards which were placed under it, were not thick enough to prevent the water on the dock from running into it. The evidence showed that the iron was damaged from two to two and a half cents per pound, and it was claimed that it would be seen by computation that at the lowest estimate which could be made from the proof, the actual damages exceeded the amount of the verdict.

At the close of the testimony the learned judge submitted the whole case to the jury upon the questions of fact involved, in regard to which there was some conflicting evidence, instructing them as follows:

"The plaintiffs seek to recover from the defendants, who are common carriers of goods for hire, the value of three bundles of sheet-iron, which were lost while in the defendants' charge; and the damage which, they assert, a large number of bundles of sheet-iron consigned to them, suffered by the negligence of the defendants. So far as the loss of the three bundles is concerned, no dispute is made as to the liability of the defendants; and as the evidence is uncontradicted that their market value amounted to $29.54, for that sum, in any event, the plaintiffs will be entitled to recover.

As to the injury to the rest of the iron, the plaintiffs claim that about two-thirds of the whole consignment of 559 bundles, which would be about 373 bundles, equal, upon the evidence, to 48,490 pounds, was damaged to the

Goodwin *v.* Baltimore and Ohio Railroad Company.

extent of two cents per pound; and as there is no conflict upon the amount of the damage—if the defendants be liable at all under the rules of law, which I shall give you— you will find no difficulty in calculating the amount of your verdict. But, in any event, in the whole, under the pleadings in this case, it must not exceed $659.

The defendants, being common carriers of goods for hire, are responsible by the common law as insurers of the property against everything, except the act of God and the public enemies, until their obligation and duty as such carriers terminated; as to that, no one connected with the case doubts. The question disputed by the learned counsel for the defendants is, "when did the duty of the defendants as common carriers cease?" Upon that subject, I charge you that that extent of duty and liability continued upon the defendants until the expiration of a reasonable time after notice to the consignees of the arrival of the iron, for the latter to remove it from the possession of the defendants; and during the period, until such reasonable time had elapsed, the plaintiffs were under no duty, except to proceed with due and reasonable diligence to remove the property, and that of course includes a duty upon them to endeavor, by all reasonable exertion, to reach and remove the goods, whatever obstructions there were. Whatever you think was reasonable, under all the circumstances in that respect, the plaintiffs were bound to do. The defendants were bound to deliver the goods at the usual place, which they did, and they were bound to deliver them in a conveniently reasonable method for their removal, and the plaintiffs were bound to exercise reasonable diligence for their removal from such place. But just here arises the important question of fact for your determination, which I leave exclusively to you, namely: Had a reasonable time elapsed before the rain which injured the iron, after notice of its arrival, for the plaintiffs to remove it? The term "reasonable time" must depend

upon the circumstances, the character of the property to be removed, the condition of the pier, and all such like matters. You must first consider what was the condition of the pier. Was it so obstructed by the other freight that the plaintiffs, by reasonable care and diligence, could not reach and remove their goods, as they claim, or was it, as the defendants insist, in such condition that the cartman could get to and remove his goods by taking his stand among the other cartmen and waiting his regular and reasonable turn, as they claim the others did? Because, of course, what would be a reasonable period to remove the goods if the pier were wholly unobstructed, or if, as the defendants claim, there was at all times a passage, or, as the witnesses say, a " gangway," open sufficiently for the carts to pass to and fro, would be very different from what would be necessarily required, and, therefore, reasonable for that purpose if the pier were, by the arrangement of other freight, so filled up and obstructed that it was impossible, for days at a time, to get to the spot where the defendants chose to place this iron. The testimony, conflicting as it is upon these matters, is especially your province to consider and weigh; and, reviewing it all, it will be for you to say, whether a reasonable time, after notice for the removal of the iron, circumstanced as you find it to have been on this pier, had expired, before the happening of the storm which occasioned the damage, which it is not disputed the iron suffered. If it had, then, as to so many bundles, or all, if you find such to have been the fact as to the whole, as could have been removed before the storm, the defendants' duty as common carriers ceased. But if you find that such a reasonable time had not expired, or had not expired as to all the iron, then, as to so many bundles as it had not expired, the duty and liability of the defendants as common carriers remained, and for the damage to that number of bundles they would be liable. But if you should be of opinion that, as to all

Goodwin *v.* Baltimore and Ohio Railroad Company.

or any of the iron, a reasonable time for its removal had expired before the storm, still some duty rested upon the defendants. Their liability as insurers ceased; but they were bound, nevertheless, to exercise some duty as respects the property, until the plaintiffs had actually removed it. From the time that the reasonable period for the removal of the goods expired, the defendants' duty or liability became that of warehousemen, which required that the defendants should exercise over the property, and for its protection, ordinary care and diligence, which means that degree of care which persons of ordinary prudence would usually take of such property. And if you find that the period of time had elapsed, which, as I have explained to you, would convert the liability of the defendants from that of insurers to that of warehousemen, then it rests with the plaintiffs to satisfy you upon the evidence that the defendants did not take that care of this property which persons of ordinary prudence would usually take of such goods, the burden of proof of negligence being then on the plaintiffs. If you reach this branch of the case, you will say whether the plaintiffs have proved that degree of negligence against the defendants. If they have, the defendants will be liable, even though their duty as common carriers was ended.

These views cover all the instructions which I think the case demands, to enable you to reach a proper verdict, and I leave the case to you."

To this charge, and each and every portion thereof, the defendants excepted severally.

The defendants' counsel asked the court to charge that it was the duty of the plaintiffs, after the goods were placed on the wharf, to have used proper and reasonable precautions to protect them while lying there. The court refused so to charge; to which refusal the defendants' counsel duly excepted.

The jury rendered a verdict for the plaintiffs, and assessed their damages at $659.

A motion was made by the defendants, upon the judge's minutes, for a new trial, which was denied; and thereupon judgment was entered upon the verdict; and the defendants appealed.

*John Slosson,* for the appellants.

I. The rule laid down by the judge in his charge to the jury in respect to the continuance of the defendants' liability as carriers, was not, it is submitted, the correct one, and though in some respects the charge on that head may be unobjectionable, taken as a whole, it was calculated to mislead the jury. The rule as thus laid down was this: That the special liability of the carriers continued until the expiration of a reasonable time after notice to the consignees of the arrival of the iron, for the latter to remove it; that until such reasonable time elapsed, the plaintiffs were under *no duty*, except to proceed with reasonable diligence, and by all reasonable exertions to *remove* the property; that it was for the *jury to say*, what exertions, under all circumstances, the plaintiffs were bound to make; that the goods were to be delivered in a conveniently reasonable method for their removal, and that what was a reasonable time within which to effect the removal, must depend upon the circumstances, the character of the property, " the condition of the pier, and all such like matters;" of all which the jury were to judge. Nor is the objection to the charge lessened by the manner in which the judge explained his views, viz., that "what would be a reasonable period, if the pier were wholly unobstructed, or if there was, at all times, a passage-way to the iron, would be very different if the pier were, by the arrangement of other freight, so filled and obstructed that it was impossible, for days at a time, to get to the spot where the defendants chose to place this

Goodwin *v.* Baltimore and Ohio Railroad Company.

iron." It may be remarked, in passing, that the evidence wholly fails to justify the use of such strong expressions as those italicised, and they were unquestionably calculated to give the jury the impression that in the opinion of the court there was evidence which would justify them in finding, that for *days together* there was *no possibility* of reaching the spot where this iron was placed ; whereas all the evidence shows, that the displacement of a few hogsheads was all that was necessary to make an unobstructed passage at any time, to the iron. It is not difficult to see that under such a charge, a verdict for the plaintiffs was inevitable, for it was telling them, almost in terms, that notwithstanding the iron had been safely landed on the wharf, according to custom, (which is not disputed,) and notice of the arrival given to the plaintiffs in due time, no duty devolved upon the plaintiffs to look after and protect the iron, until it could be removed, nor to do anything more than the jury might think reasonable for the purpose of removing any hogshead or hogsheads, that stood in the way of the iron, which obstruction they were told, if they believed the plaintiffs' witnesses, amounted to an " impossibility for days at a time to get to the spot " where the iron lay, and that if the jury should think it unreasonable for the plaintiffs to do anything in the way of removing such obstacles, (which the verdict clearly shows they did, for there is no pretense that the plaintiffs made the least effort in that regard,) the extraordinary liability of the defendants as common carriers continued, until there was a perfectly unobstructed passage for the plaintiffs' carts to reach the iron. No reported case goes to anything like this extent. It continues the liability of the carrier as an insurer, after he has done everything possible for him to do in the way of a safe and convenient delivery, (for it will be remembered that there is not a particle of evidence to show that the tobacco could have been disposed of in any other way, on the pier, than it actually

was disposed of,) and it relieves the consignee of all obligation to protect, or take care of his goods, until every obstacle in the way to them is removed.

Here was a pier, or wharf, only about thirty-one feet wide, according to the diagram, by three hundred and twenty-one feet long. Three other vessels, besides the *Carrol*, were discharging and receiving cargo; the iron was landed in the customary way; the hogsheads occupied only the space which the rules and regulations governing the distribution of cargo on the pier allowed. Three other vessels who were receiving and landing cargoes were entitled to their shares of the pier, and one hundred carts were coming and going, bringing and taking away merchandise all the time. To hold that the owners of the *Carrol* (and the same rule would apply to each of the other three vessels) remained liable as insurers of each and every article discharged from their vessel on that dock, until a free passage-way to them was made, so that each could be "conveniently" got at, seems to me, with great respect to the learned justice, and his really able charge, to be carrying the doctrine to a very great, and practically to a very dangerous extent. The plaintiffs knew, as well as the defendants, the condition of trade at this wharf, and the extreme difficulties attending the arrangement of a great mass of merchandise on so narrow a pier, and were bound to accept the condition of things, and to govern themselves accordingly.

The true rule, I apprehend, is this: That the contract of the carrier is completed, when notice has been given to the consignee, of the arrival of the goods, sufficient to give him a fair opportunity to provide suitable means to assume the care of and carry them off, and when they are safely landed on the wharf, in the usual and customary way. This notice is in lieu of personal delivery, and when that is given, and a reasonable time allowed the consignee to take possession of his goods, either for re-

moval, " or to put them under proper care and custody," as it is expressed in *Richardson* v. *Goddard*, cited below, the delivery is complete. After that, the goods are at the risk of the consignee; he is bound, if he cannot immediately remove them, to protect them; he cannot be idle and do nothing, and the carrier remain responsible as such, until he can get convenient access to the merchandise. Any other rule would be uncertain, indefinite, and liable to the greatest abuse in the hands of a jury, and would be detrimental to commerce, especially in a city like New York. (*Ang. on Carriers*, §§ 313, 315. *Fisk* v. *Newton*, 1 *Denio*, 45. *Richardson* v. *Goddard*. 23 *How. U. S.* 39. *Miller* v. *Steam Navigation Company*, 6 *Selden*, 438. *Ely* v. *New Haven Steamboat Company*, 53 *Barb.* 214, 215. *Price* v. *Powell*, 3 *Comst.* 322. *Flanders on Shipping*, § 275.) In the case of the ship *Grafton*, (*Olcott's U. S.* 43,) the court says : "By the established course and custom of trade in New York, goods or freight may be delivered at the wharf, and need not be tendered personally to the consignee. A delivery of the cargo on the wharf in New York, with notice of the time and place of unloading, places the goods at the risk of the consignee, and discharges the ship from liability." After receiving notice, the consignee "is bound to provide suitable persons to take care of the goods and carry them away." (*Story on Bailm.* § 545, *citing* 4 *Pick.* 371. 1 *Rawle*, 203.) In *Richardson* v. *Goddard*, above cited, Justice Grier says: "To constitute a valid delivery on the wharf, the carrier should give due and reasonable notice to the consignee, so as to afford him a fair opportunity of providing suitable means to remove the goods, or put them under proper care and custody." And in *Roth* v. *Buffalo and State Line Railroad*, (34 *N. Y.* 553,) the court says : " The owner ought not to be permitted to prolong the strict and rigorous liability of the carrier, by refusing or neglecting to receive his baggage for an unreasonable length of time after the

transit is ended. The obligations of both parties are, to some extent, reciprocal."

It does not relieve the charge on this subject, of the objections thus urged against it, that the learned judge told the jury that the duty of the plaintiffs to remove the goods "included the duty to endeavor, by all reasonable exertion, to reach and remove the goods, whatever obstructions there were;" for in the next sentence he tells them that, "whatever they (the jury) should think was reasonable, under all the circumstances, the plaintiffs were bound to do;" and, of course, were bound to do nothing more. So that the question of the defendants' continued liability as insurers of this iron is made to depend on what exertions a jury might think the plaintiffs ought to make, to remove a few hogsheads out of the way; and if they should happen to think that, under the circumstances, no exertion at all was reasonably required, (as they certainly did in the present case,) then the carriers' liability continued.

II. The learned judge erred in refusing to charge the ninth and tenth requests of the defendants. The ninth request was that "under the evidence the defendants were under no obligation to put the iron *in a warehouse.*" The tenth request was that "the covering of the iron by the stevedore, as proved, was all the duty which, under the circumstances, as proved, the defendants owed to the plaintiffs' iron after it was put on the dock." The verdict being general, the court cannot say whether the jury found that a reasonable time in which to take away the iron had not expired, and that the defendants were, therefore, still liable as common carriers, or, that having expired, the defendants had failed in performing their duty, in respect to the care and protection of the iron, while in their possession. It is therefore important to ascertain whether the ruling on the latter head may not have misled the jury. Assuming that the verdict may have turned on the

latter point, the question is, what degree of care did the law exact of the defendants, under the circumstances, as proved? The facts were these: Just before the storm, on Friday, Willetts, the receiving and delivery clerk, apprehending a rain, asked the plaintiffs' cartman to go to the plaintiffs' and get tarpaulins. He said he would be d——d if he would. This is not contradicted. Willetts then himself went on board the *Carrol* and got a supply of canvas, and sent and got tarpaulins from the store (plaintiffs') and had the iron covered up. All the iron was covered. Dickinson & Co., whose iron lay near by the plaintiffs', covered their own iron. Goodwin, the plaintiff, himself swears that it was his custom, when a large quantity of tin plates arrived for him from an English port, so that he could not carry it all away in one day, to send down and cover the plates with tarpaulins, to guard against the contingency of rain; and when asked why he did not observe the same precaution in respect to this iron, his only answer was, "We had not possession of the iron; we could not get at it; we had no control over that iron; we did not consider it our duty; we wanted to ride the iron away;" and when asked if he meant to say "whether he could not have sent down and covered that iron on any day after he received notice," he answered, "I do not say I could not— it was a possible thing to do." That it was done by the defendants, is not only proved by two witnesses, but that it was done, and could be done without the least difficulty, is manifest from the testimony on both sides.

The question then is: Did the defendants do all they were bound to do in the way of protecting this iron, when, on the plaintiffs' refusal to cover it, they themselves sent and covered it with tarpaulins? The court will observe, that this is not the case of an absent or unknown consignee, or one who could not be found, or one who refused to receive, but of a consignee, who not only was present, but had actually taken away a portion of this

very shipment of iron, and refused to cover the residue, when apprised of the coming storm.    What are the duties and liabilities of the carrier under such circumstances, supposing his extraordinary liability as carrier to be ended? We cited authorities under the previous point, to show that after reasonable notice and landing of the goods, they were at the risk of the consignee; but suppose some duties and liabilities to remain in the carrier, what are they? We answer, the duties and liabilities only of a mere gratuitous bailee—a bailee without compensation.    In the case of *Roth* v. *Buffalo and State Line Railroad Company,* (34 *N. Y.* 548,) this duty is stated to be that of "a mere bailee in deposit, gratuitously or otherwise, according to circumstances—liable only for losses occasioned *by his own fault.*" In *Goold* v. *Chapin,* (20 *N. Y.* 267,) it is held that "where the carrier is not able, with due diligence, to find any one to receive the goods in behalf of the owner, and there is no safe place of deposit within his reach, his duty as carrier is at an end, and he then becomes a *mere ordinary bailee.*"    And then, speaking of the duty of depositing in the carrier's own warehouse, (or any other, of course,) the court says: "That, however, can only be where there has been a failure by the owner or his agent to receive the goods."    If it was the duty of the defendants to deposit this iron in a warehouse, as the refusal of the judge to charge the ninth request implies, and left the jury to infer, when did that duty arise?    As clearly on the first day the iron left the ship, as on the last, and under the law as laid down to the jury by the court, the defendants were in fault in not sending the goods to a warehouse, from the moment the hogsheads were landed, (under the direction of a stevedore, be it remembered, who was limited by the rules and regulations of the dock, to a certain space,) and it was discovered that a cart could not be backed up to the iron itself, without removing a few of the intervening hogsheads of tobacco.    The rule as laid down in *Miller* v.

Goodwin *v.* Baltimore and Ohio Railroad Company.

*Steam Navigation Company,* (10 *N. Y.* 438,) is the true one, in respect to storing goods after arrival. "So when goods are safely conveyed to the place of destination, and the consignee is *dead, absent or refuses to receive,* or is not known, and cannot, after due efforts are made, be found, the carrier may discharge himself from further responsibility, by placing the goods in store with some responsible third person in that business at the place of delivery, for or on account of the owner," and it is confidently asserted that these are the only cases in which the carrier has a right to send the goods to a warehouse, and subject the consignee to additional charges. The rule, as laid down in the case last cited, is in the very words used by the court in *Fisk* v. *Newton,* (1 *Denio,* 45.) *Angell,* in his treatise on *Common Carriers,* (§ 291,) adopts the case of *Fisk* v. *Newton* as the correct exposition of the law on this subject, and so does *Flanders,* in his treatise on *Shipping,* (§ 276,) and to the same effect is *Ostrander* v. *Brown,* (15 *John.* 39.)

We think it quite clear, then, that whatever duty these defendants owed to the plaintiffs' iron on the termination of their obligations as carriers, it was not to send the articles to a warehouse; indeed to have done so, under the circumstances, would have been a gross breach of duty, and the plaintiffs might well have treated it as a refusal to deliver, or perhaps a conversion, and we insist that the refusal to charge the written request was erroneous; and that the court cannot say that the verdict may not have turned on that very point, to wit, the defendants' omission to send the iron to a warehouse. What, then, under the facts, was the duty of the defendants, treating them as mere gratuitous bailees? The rule as to gratuitous bailees is, that they are responsible only for gross or culpable negligence. (*Jones on Bailm.* 8. *Tompkins* v. *Saltmarsh,* 14 *Serg. & R.* 275. *Angell on Carriers,* § 323.) The bailment is gratuitous if the bailee is not to be paid for his care and custody. (*Angell on Carriers,* §§ 17, 304, 295.) "Where the under-

taking is gratuitous, and the party has acted *bona fide*, it is not consistent either with the spirit or policy of the law, to make him liable to an action." (*Shiells* v. *Blackburne*, 1 *H. Black.* 158.) In determining what degree of care a gratuitous bailee is bound to exercise, regard must be had to the nature and quality of the article intrusted to his care, and the dangers to which it may be exposed. (*Ang. on Car.* § 26.) The article was iron, in sheets, difficult to be moved, and not liable to be stolen; the only protection necessary was, to cover it, to guard it against rust from rain; this was, as we contend, the plaintiffs' duty; but, on their refusal to perform it, the defendants owed them no greater or higher duty. It certainly was not *gross negligence* in them, to do all they could to protect this iron against the effects of a sudden shower, after the plaintiffs had refused to do anything. Had the iron belonged to the defendants, what more could they have done than they did? And this was the rule of diligence given by the judge. They did exactly what the plaintiffs themselves always did in respect to their cargoes of tin when lying on the wharf, and the defendants could not be asked to do more than the plaintiffs themselves always did. The test question on this head is, did the defendants act *bona fide* and with all the prudence which, under the circumstances, they were called upon to exercise? And how can it be contended for a moment that they did not? Under such circumstances, to leave it to the jury to say, whether the defendants had failed in their duty, by not sending the iron into a warehouse, or by not doing something else which they did not do, was, we respectfully submit, erroneous, and calculated to mislead.

III. The judge charged the jury that it was the plaintiffs' duty "to endeavor, by all reasonable exertions, to reach and remove the goods, whatever obstructions there were." Assuming, for the present purpose, that the judge was right, in holding that the extraordinary liability of the defendants as common carriers continued until a reasonable

Goodwin *v.* Baltimore and Ohio Railroad Company.

time had elapsed, after notice to the plaintiffs, to enable them to take the iron away, and that it was the duty of the plaintiffs, as charged above, to use every reasonable exertion to reach and remove the goods, whatever obstructions there were, (which latter proposition cannot be disputed,) the evidence wholly fails to sustain the verdict Taking the plaintiffs' own evidence, and applying the judge's rule, that it was the plaintiffs' duty "to endeavor by all reasonable exertions to reach and remove the goods, whatever obstructions there were," and it is manifest that by an effort which could not have been a very serious one, these hogsheads could have been removed—rolled on one side, so as to give access to the iron; and the only ground on which the verdict, on this evidence, can be sustained, is that the plaintiffs were under no obligation to make any effort whatever to remove the intervening obstacles, but had a right to wait until every impediment had been got out of the way by others, and this, too, on a dock crowded with freight not only from the *Carrol*, but three other vessels; a proposition which, if sustained, extends the liability of the carrier *as an insurer* to a most extraordinary and indefinite extent; and, as we submit, beyond any legal limits known to the profession. With this extra exertion the whole iron could have been removed in one day.

I maintain that this verdict cannot stand, on the plaintiffs own evidence, under the instructions of the judge, as quoted above, in respect to the plaintiffs' duty. If, in connection with this, we take the defendants' testimony, that at the time of the rain three-fourths of the hogheads had already been taken away; that there was no obstruction, so that a cart, taking its regular course, could get to the iron, and that carts were all the time passing down to the extreme end of the *Carrol*, (which would bring them to the extremity of the pier,) receiving freight and bringing freight there; that Willetts, the receiving and delivering clerk of the ship, showed the plaintiffs' cartman (and

this is uncontradicted) "the way, several times, by which he could get the iron," and urged him several times to go and get the iron, and "there were times when he came there without any trucks with him;" that the cartman told Willets that he could go and get his iron if he could take his turn, which is not contradicted; it makes, we submit, a clear case that the plaintiffs were altogether inexcusable for permitting their iron to remain so long. Is it a proposition to be tolerated, that a party may allow his merchandise to lie on an exposed wharf four or five days, after it has been landed in the usual and customary manner, and after notice that it is so landed, and that he is expected to come and take it away, and never himself go near it, but content himself with reports from his cartmen; when, by a little, or even a considerable effort, all obstacles could have been removed; and thus remain passive and indifferent until a casualty occurs, and then claim that the carrier had never completed the delivery of the merchandise, because some obstructions lay between it and a free passage from the streets; and that this extraordinary liability continued until the owners of the hogsheads had removed them all out of the way? Is this the doctrine of a delivery on the wharf of a great commercial city like New York, after notice to the consignee, as laid down in all the cases?

*M. L. Townsend,* for the respondents.

I. It was the province of the jury to pass upon the questions of fact presented by the evidence in the case, and their verdict upon those questions is final.

II. The testimony fully justified the jury in finding the following facts: 1st. That the iron which was injured by the water was placed by the defendants' agents, when discharged from the *Carrol,* at the lower end of the pier, and that the pier was so blocked up and obstructed by hogsheads of tobacco, placed there by the defendants' agents,

from the same vessel, as to render it impossible for the plaintiffs' cartmen to get the iron, until after the rain storm. 2d. That the plaintiffs used all reasonable means to get the iron away, by daily, and several times each day, sending their cartmen to get the iron, from the time they received notice of its arrival, until after the storm. 3d. That the iron was not properly covered by the defendants' agents, in order to protect it from the rain; nor was proper *dunnage* placed under it, to prevent the water which ran down the pier from running into it, in consequence of which it became rusted and injured. 4th. That the damage to the iron, at the lowest estimate, exceeded the amount of the verdict.

III. The plaintiffs had a *reasonable* time, in view of all the circumstances, after notice of the arrival of the iron, to take it away; and it was the duty of the defendants to have placed the iron in such a condition as that the plaintiffs could, by ordinary and reasonable efforts, obtain it. And what was *reasonable,* was solely for the jury to determine, under all the circumstances. (*Story on Bailments,* § 509. *Angell on Carriers,* §§ 284, 287, 303. *Price* v. *Powell,* 3 *N. Y.* 322. *Clendaniel* v. *Tuckerman,* 17 *Barb.* 184. *Lamb* v. *Camden and Amboy Railroad and Tr. Co.,* 2 *Daly, C. P.* 454.) 1. The duty of carriers, as laid down by Judge Story, is, " to safely and securely carry the goods to their place of destination, and there to deliver them, in a reasonable time and in a reasonable manner." " It is not sufficient to carry the goods to their place of destination, and then place them on a wharf, but due notice should be given to the consignee, of their arrival, and the goods placed in safe custody, so that they may, upon such notice, remove them in a reasonable time." (*Story on Bailments,* § 509.) 2. The arbitrary rule contended for by the defendants, viz., that their duty ceased when they had placed the goods upon the wharf, and given notice, is neither law nor common sense. The goods must be placed in a

*safe* condition, and where they can be got at by the consignee in a reasonable time, by the use of ordinary means. To place heavy bundles of iron at the end of a pier, and then block up the pier with a ship's cargo, as in this case, so that the iron could not be reached with a cart, is not a delivery. So far as the plaintiffs were concerned, the iron had better have remained in Wheeling, from whence it came, or in the ship's hold, where it would have kept dry.

IV. If the defendants' liability as *insurers* had ceased before the iron was actually received by the plaintiffs, their liability as depositaries or warehousemen immediately attached, and continued until the iron was removed by the plaintiffs, after the storm, and as such the defendants were bound to take ordinary care of the property. (*Story on Bailm.* §§ 444, 448 *to* 450, 452, 454. *Ostrander* v. *Brown,* 15 *John.* 43. *Goold* v. *Chapin,* 20 *N. Y.* 259. *Clendaniel* v. *Tuckerman,* 17 *Barb.* 184. *Lamb* v. *Camden and Amboy Railroad and Tr. Co.,* 2 *Daly,* 454.) Judge Story defines the liability as follows: "If the consignee is unable, or refuses to receive the goods, the carrier is not at liberty to leave them on the wharf, but it is his duty to take care of them for the owner." (*Story on Bailments,* § 544.) 1. The court properly left the question to the jury, charging them "that if the defendants did not take that care of the property which persons of ordinary prudence would usually take of such goods, they were liable;" and also instructing them that the burden of proof was upon the plaintiffs to establish the fact. 2. We have already shown that the defendants did not sufficiently cover the iron, nor place proper *dunnage* under it, in order to keep it from getting wet, and the finding of the jury is conclusive upon the question of fact.

V. The concise and able charge of the learned judge embraced all the law, upon which it was the duty of the court to instruct the jury, and none of the exceptions to the charge, or to the refusals to charge as requested, are

Goodwin v. Baltimore and Ohio Railroad Company.

well taken. The propositions of law contained in the charge dispose of all these exceptions, as well as the exception to the refusal of the court to dismiss the complaint.

*By the Court,* GEO. G. BARNARD, J. This action was brought to recover $650. This amount was made up of two items: one for three bundles of sheet-iron lost by the defendants, who had received it as common carriers, and had failed to deliver it, amounting to $29.54; the other was a claim for damages sustained by the plaintiffs by reason of injury caused by the defendants to other bundles of sheet-iron which the defendants had also received as common carriers, to be delivered to the plaintiffs in New York. As to the first item, no question can be made; the loss is proved, and the defendants' liability established. As to the remaining clause, the evidence established that the iron was unloaded upon the wharf in New York; that the plaintiffs received notice of the arrival of the ship in which the iron was brought; that they sent for their goods, and got a small portion uninjured; they sent for they remainder, but were unable to get it until some days after it was placed upon the pier, by reason of other freight having been so placed that it was impossible to reach the property in question; while it was in this position it was damaged to the extent claimed by the plaintiffs, by rain. Common carriers are liable in two capacities; one as insurers, and the other as warehousemen. If the injury happened while the defendants were insurers, the action is made out, without further inquiry. But the property was unloaded and upon the pier; it had been, for five days. The defendants were bound to deliver. Delivery is not effected by placing the property in a position from which it cannot be obtained by the person to whom delivery is to be made. It thus became a nice question whether the defendants' liability as common carriers, in all its rigor, had, under the circumstances, ceased, and if so, whether

the defendants had exercised that care of the property required of them as warehousemen. The judge at the circuit laid down, with eminent fairness and accuracy, the dividing line between the two liabilities, and the principles governing each. The jury have found for the plaintiffs.

Upon the merits, I am of the opinion the verdict is sustained by the evidence, and that the judgment should be affirmed, with costs.

Judgment affirmed.

[FIRST DEPARTMENT, GENERAL TERM, at New York, November 1, 1870. *Ingraham*, P. J., and *Geo. G. Barnard* and *Cardozo*, Justices.]