---

(82 Misc. Rep. 38.)

WINDSOR et al. v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Equity Term, Erie County. August, 1913.)

1. CARRIERS (§ 199*)—MAINTENANCE OF STOCKYARDS—DISCRIMINATION.

It is the duty of a domestic railroad corporation, which, for the convenience of its patrons, maintains stock yards on premises acquired and held for railroad purposes, to serve the public without unjust discrimination.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 901–905; Dec. Dig. § 199.*]

2. WAREHOUSEMEN (§ 1*)—LEGISLATIVE POWER TO REGULATE.

It is competent for the Legislature to regulate the business of warehousemen as well as that of common carriers.

[Ed. Note.—For other cases, see Warehousemen, Cent. Dig. § 1; Dec. Dig. § 1.*]

3. CARRIERS (§ 201*)—DISCRIMINATION BETWEEN SHIPPERS—INJUNCTION.

Where, by a long course of business dealing, the defendant carrier had given the plaintiff shippers the same unrestricted right of access to stockyards as was given to their competitors, and where such right of access was taken away by defendant from plaintiffs but not from their competitors, occasioning great inconvenience to plaintiffs and their customers, to their irreparable loss through losing opportunities for sales of stock, plaintiffs having no adequate remedy at law, they were entitled to an injunction restraining defendant from discriminating between them and their competitors.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 906–915; Dec. Dig. § 201.*]

Suit in equity for injunction by Millard F. Windsor and another against the New York Central & Hudson River Railroad Company. Judgment for plaintiffs.

William J. Donovan, of Buffalo, for plaintiffs.
Irving W. Cole, of Buffalo, for defendant.

LAUGHLIN, J. This is a suit in equity, by the members of a copartnership engaged in business as commission brokers in buying and selling live stock, to enjoin the defendant, a domestic railroad corporation, which maintains and conducts, in connection with its business as a common carrier and for the convenience of the plaintiffs as consignees or owners of live stock and its other customers and others, certain stockyards on premises acquired, held, and owned by it for railroad purposes, from discriminating against the plaintiffs by locking the pens which it had assigned to and set apart for their use in their said business, thus preventing them from exhibiting their live stock to intending purchasers, while at the same time affording its other custom-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ers the free and unrestricted use of the pens assigned for their use without locking the same. The defendant has maintained the stockyards in Buffalo for a very long period of time, and by a uniform custom and course of business it has held out and still holds out, not only to its own customers, but to the customers of other carriers, that it will receive into its stockyards and feed and care for stock for fixed charges and afford facilities for the sale thereof, and it has done and still is doing so. There is some evidence tending to show that the yards are also designed for the reception from drovers of stock which has not been and may not be transported by common carrier; but it clearly appears that nearly if not all the stock received and cared for in the defendant's stockyards is received over the defendant's line or over the line of another common carrier or is to be carried by the defendant or another common carrier.

[1] The learned counsel for the defendant contends that the defendant in conducting the stockyards is acting as warehouseman, and that it may at pleasure discriminate between its customers. We are not now concerned with the question as to whether a private warehouseman may discriminate between his patrons; nor are we concerned with the question as to the rule of law applicable to the liability of the defendant for loss or injury to stock while in its stockyards. The only statutory authority the defendant appears to possess is to conduct business as a railroad corporation. Incidental to that business it undoubtedly has the right to establish warehouses into which it may unload and store freight, if not removed within a reasonable time after notice, and thus terminate its liability as a common carrier and become liable only under the law applicable to a warehouseman (Goodwin v. Baltimore & O. R. Co., 58 Barb. 195; Fenner v. Buffalo & St. Line R. R. Co., 44 N. Y. 505, 4 Am. Rep. 709; Weed v. Barney, 45 N. Y. 344, 6 Am. Rep. 96; Pelton v. R. & S. R. R. Co., 54 N. Y. 214, 13 Am. Rep. 568; O'Neill v. N. Y. C. R. R. Co., 60 N. Y. 138; Bank of Oswego v. Doyle, 91 N. Y. 32, 43 Am. Rep. 634; Conkey v. Milwaukee & St. Paul R. Co., 31 Wis. 619, 11 Am. Rep. 630); and it may establish stockyards for receiving stock for transportation and for unloading and holding stock for delivery, and doubtless its liability for stock in such yard would not be measured by the strict rule of the common law applicable to common carriers (Missouri, K. & T. R. Co. v. Byrne, 100 Fed. 359, 40 C. C. A. 402). It is, however, the duty of a common carrier under the common law to serve the public for reasonable compensation without unreasonable or unjust discrimination in the reception or delivery of freight; and this rule of the common law by the adoption of the Constitution of this state became and has remained the law of this sovereignty. Root v. Long Island R. E. Co., 114 N. Y. 300, 21 N. E. 403, 4 L. R. A. 331, 11 Am. St. Rep. 643; Lough v. Outerbridge, 143 N. Y. 271, 38 N. E. 292, 25 L. R. A. 674, 42 Am. St. Rep. 712; Armour Packing Co. v. Edison El. Co., 115 App. Div. 55, 100 N. Y. Supp. 605; People v. Budd, 117 N. Y. 1, 22 N. E. 670, 682, 5 L. R. A. 559, 15 Am. St. Rep. 460; 3 Elliott, Railroads, 1468; 22 Wyman, Pub. Serv. Corp. § 1300.

[2] It is also the well-settled law that it is competent for the Legis-

lature to regulate not only the business of common carriers but also the business of warehousemen. Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Cotting v. Kansas City Stock Yards Co., 183 U. S. 92, 22 Sup. Ct. 30, 46 L. Ed. 92; Nash v. Page, 80 Ky. 539, 44 Am. Rep. 490; State v. Columbus, G. L. & C. Co., 34 Ohio St. 572, 32 Am. Rep. 390; Baker v. State, 54 Wis. 368, 12 N. W. 12; Webster Telephone Case, 17 Neb. 126, 22 N. W. 237, 52 Am. Rep. 404; Delaware, L. & W. R. Co. v. Central Stock Yard Co., 45 N. J. Eq. 50, 17 Atl. 146, 6 L. R. A. 855.

[3] It is alleged and satisfactorily appears that the plaintiffs have no adequate remedy at law. By a long course of business between them and the defendant there has been established a custom by which they have been afforded the same unrestricted right of access to the pens containing their stock as has been afforded to their competitors in business. It now appears that the same freedom is continued as to their competitors, but that the pens containing plaintiffs' stock are locked and they are greatly delayed in obtaining access thereto, to their serious inconvenience and to the inconvenience of their customers, and that this course of business is calculated to cause irreparable loss to them by losing opportunities for sales of their stock. By the long-established custom to which reference has been made, intending buyers pass freely into the pens and inspect stock, and negotiations for sales are conducted with them by the representatives of the owners of the stock. It is manifest that the restrictions imposed by the defendant seriously discriminate against the plaintiffs in favor of their competitors.

The defendant's only authority for operating the stockyards is derived from its statutory authority to maintain and operate a railroad. The Legislature has conferred authority upon it to acquire lands by condemnation upon the theory that it is to use them *to serve the public,* and, in my opinion, public policy requires the extension of the common law to apply to any business conducted by a transportation corporation as incidental to its business as a common carrier. If this be not so, then every state statute and every federal statute designed to secure from the public tranportation corporations equal facilities for all shippers will be frustrated. Of what avail is it that the carrier is prohibited from discriminating with respect to rates, if it may discriminate with respect to facilities either at the point of shipment or the point of delivery? If the court is powerless to intervene on behalf of the plaintiffs on the facts now presented for adjudication, then the defendant is at liberty to contract with one shipper to receive into its stockyards and care for his stock and afford him an opportunity of exhibiting it there for sale without other charge than for the actual expense in feeding and caring for the stock, or without charge even for those items, and to charge another shipper the same freight rate and to require him to remove his stock from its cars and premises within a reasonable time after its arrival at the point of destination, and to refuse to care for or feed the stock after its arrival or to afford the owner facilities for exhibiting it for sale while on the defendant's premises. In the early days when the courts declared it to be the duty of common

carriers to serve the public without unjust discrimination, carriers neither conducted warehouses nor stockyards; but the warehouse and stockyard business as conducted by common carriers under their charters as transportation corporations is incidental to their business as common carriers and is directly connected therewith. On principle, therefore, the same rule should be applicable to the warehouse and stockyard business with respect to discrimination as to the transportation of freight. The common law is elastic; and it expands to meet changed conditions and methods of transacting business. I do not say that it is the duty of the defendant to establish and maintain a stockyard; but I hold that, since it has established and does maintain a stockyard without other authority than its charter as a transportation corporation and as incidental to its transportation business, it is its duty, even though there be no statute enjoining such duty, to serve the public, whom it has invited by this long-existing custom and still invites to make use of its stockyards, without unjust discrimination, and that it is within the province of the court to enforce this duty by mandamus or injunction. See Delaware, L. & W. R. Co. v. Central Stock Yard Co., supra.

In most of the cases which have come before the courts, the question arose with respect to the performance of a statutory duty or an express contract obligation; but in the Webster Telephone Case, supra, it was held to be the duty of a telephone company which assumed and undertook to supply a public demand to serve all the public alike without discrimination, although the Legislature had not enjoined such duty upon it. That decision was placed upon the ground that the telephone company was a public service corporation and that, having derived its authority from the public, it was its duty to serve the public without discrimination.

In Delaware, L. & W. R. Co. v. Central Stock Yard Co., 43 N. J. Eq. 71, 10 Atl. 490, the vice chancellor, on an application for a temporary injunction, expressed the opinion that the defendant stockyard company in that case in effect owed the duty to the public to serve all alike without discrimination on the theory that the business of a stockyard company and of a common carrier are quite similar. On the final hearing, however, the vice chancellor adhered to the general views originally expressed but pointed out that the question presented was not the right of an individual to have his stock yarded but whether the plaintiff, a transportation corporation, could compel the defendant to receive stock from it, and that there was no analogy between the duties of a common carrier and those performed by the defendant, which was not a transportation corporation or common carrier and merely maintained a private stockyard. The opinions in the Webster Telephone Case, supra, and Delaware, L. & W. R. Co. v. Central Stock Yard Co., supra, tend to sustain the views which I have expressed.

The learned counsel for the defendant insists that the evidence does not show unjust discrimination for the reason that it appears that the plaintiffs have asserted claims for the loss of live stock after the stock has been delivered from the cars into the stockyards, and that

one of their consignors brought an action against the defendant to enforce such liability. It appears that in some instances competitors in business of the plaintiffs or their consignors asserted claims against the defendant for the loss of live stock while in the stockyards, and that some of these claims were adjusted and others were abandoned without suit. The only difference shown by the evidence in the relations between the plaintiffs and the defendant and the competitors of the plaintiffs and the defendant is, on this one point, that thus far no action has been brought by the latter to enforce a disputed liability for the loss of stock while in the stockyards of the defendant. The defendant was doubtless at liberty to make and promulgate general rules applicable alike to all of its customers similarly situated, but there is no evidence of the adoption or promulgation of such rules. It is perfectly clear from the evidence that the defendant has arbitrarily attempted, by discriminating against the plaintiffs in the manner shown, to compel them to waive or release in advance any and all claims for the loss of stock delivered into the pens in the defendant's stockyards, although the defendant retains the right of access to the pens for the purpose of feeding and caring for the stock for which it receives compensation as stated. It has not attempted to exact releases or an agreement on this point from the plaintiffs' competitors, but it insists that the threat of the plaintiffs and the action by one of their consignors to hold the defendant liable is sufficient to warrant it in locking the pens the moment the stock is driven into them from the cars until the plaintiffs consent to accept the defendant's count of the number of head of stock, or consent to recount the stock with a representative of the defendant and to accept a delivery of the stock, and in effect consent to a termination of the liability of the defendant as a common carrier, although the stock would still be permitted to remain in the yards of the defendant. The defendant evidently wishes to force an agreement in advance on the part of the plaintiffs that from and after such count the stock shall be held by the defendant at the risk of the plaintiffs. The defendant has no right to discriminate against plaintiffs merely because they will not agree with it in advance with respect to what its duty or liability in such case is. The attorneys for the respective parties draw attention to the fact that the Legislature has now given the public service commission jurisdiction over stockyards as well as over common carriers, and it appears that the Legislature has embraced in the terms "transportation of property" every "service in connection with the receiving, delivery, * * * storage and handling of the property transported" (Pub. Serv. Com. Law [Consol. Laws, c. 48; Laws of 1910, c. 480], § 2, subd. 14; Id. § 2, subd. 21, added by Laws of 1913, c. 506; Id. § 25); but that does not deprive the plaintiffs of redress at the hands of the court and has no special bearing on the questions presented for decision.

The plaintiffs, therefore, are entitled to have the defendant enjoined not from locking the pens but from discriminating between the plaintiffs and their competitors in business with respect to access to the pens and with respect to affording facilities for the exhibition

of stock to prospective buyers in negotiating sales thereof, and from locking the pens containing the stock of the plaintiffs unless pursuant to some general rule applicable to and enforced alike against the plaintiffs and all of their competitors similarly situated, and for judgment for the costs of the action.

Judgment accordingly.