Conkey vs. The Milwaukee and St. Paul Railway Company.

CONKEY VS. THE MILWAUKEE AND ST. PAUL RAILWAY COMPANY.

COMMON CARRIERS. (1) *Goods shipped by several successive connecting lines; special liability of carrier continues unbroken till they reach destination; carrier in whose possession they are, when lost or injured, held liable to owner.* (3) *Some exceptions. Liabilities of carriers to each other.*

Conkey vs. The Milwaukee and St. Paul Railway Company.

1. PER CURIAM. Ordinarily, when goods are shipped to be transported by several successive and connecting lines, they are to be considered *in transit* until they reach their final destination, and the peculiar liability of a common carrier exists *continuously*, although, for the convenience of the successive carriers, the goods may be temporarily deposited in depots or warehouses on the route. And the carrier *in whose possession they are* when destroyed or injured, is liable, as such, to the owner or consignee for the loss. *Wood v. M. & St. P. R'y Co.* (27 Wis., 541), as to the above points, overruled.

2. LYON, J., is inclined to adhere to the rule laid down in *Wood v. R'y Co.*, *supra*.

3. Per DIXON, C. J., *arguendo*.

(1.) If goods are lost while waiting at the end of one carrier's line, for delivery to the next carrier, such first carrier, after responding in damages to the owner or consignee, must seek his remedy against the next carrier, if the loss occurred through his neglect to remove the goods within due time according to the course of business and the usage among carriers.

(2.) In case of an *extraordinary* interruption of communication along the line of transit (as by storm, flood, earthquake or war), necessitating a considerable delay in transportation, the carrier in whose hands the goods are may store them, and at once give notice to the consignee, and thus absolve himself from liability as carrier while such interruption continues.

APPEAL from the County Court of *Milwaukee* County.

On the 11th, 12th and 13th of May, 1870, various boxes and other packages of goods were shipped at Milwaukee to be carried upon the defendant company's road to La Crosse in this state, and to be thence carried by the Southern Minnesota Railroad Company, and delivered to the plaintiff as consignee, at Lanesboro, in Minnesota. The receipts for these goods were in the following form : " Received, Milwaukee, May 11, 1870, from X. Y. Z., in apparent good order, to be delivered in like order, the following property, marked ' Conkey Bros., Preston, Minn., R. R. Lanesboro :' [description of property]." In some cases the goods are described as marked thus: " Conkey Bros., Preston, Minn., *via* La Crosse and Lanesboro." The goods were carried over the defendant's road to La Crosse, and there unloaded into the defendant's warehouse, from which they were

Conkey vs. The Milwaukee and St. Paul Railway Company.

to be taken by the Southern Minnesota Railroad Company. During the night of Saturday, the 14th of May, before the goods had been removed by the latter company, the warehouse was destroyed by fire, and the goods of the plaintiff were destroyed with it.

This action was brought to recover the value of the goods above mentioned; and the complaint, after averring delivery to the defendant company at Milwaukee, alleges that, " in consideration of a reasonable compensation agreed to be paid by said plaintiff to said defendant, the defendant then and there undertook and agreed with the plaintiff to safely carry said goods over its said line of railway and that of the Southern Minnesota Railroad Company, to Lanesboro in the state of Minnesota, and there deliver them to this plaintiff; and that defendant did not safely carry and deliver," etc. The answer was a general denial.

At the trial, after plaintiff had shown the facts stated in the first paragraph above, making no proof of a through contract, except what is contained in the shipping receipts above described, the defendant called as a witness its general freight agent, and proved by him the following facts : " That defendant's road extended from Milwaukee to La Crosse, and there ended; that defendant gave no rates of freight on the Southern Minnesota Railroad; that it delivered freight to that railroad at La Crosse, charging that company at the time with its own charges, and back charges, if any ; that the Southern Minnesota Company delivered freight to defendant in the same way at La Crosse ; that the agents of the companies settled the accounts from time to time as suited their convenience; but that neither company had anything to do with freight, or the collection of charges thereon, after it had passed into the hands of the other company, but looked to the company alone for their own back charges."

The defendant also introduced evidence for the purpose of showing that the goods in question had been put in that portion

of its warehouse appropriated to goods intended for the Southern Minnesota Railroad Company, and from which the latter company were in the habit of taking goods without any notice or request; and that they were ready to be removed by said company before they were destroyed by fire.

The court instructed the jury that defendant's liability as a common carrier continued until the goods were transported to La Crosse and delivered to the Southern Minnesota Railroad Company, or until that company were notified of their arrival and readiness for delivery, and had refused to receive them, or a reasonable time had elapsed thereafter for taking them away.

Further instructions were given to the effect that defendant's liability as a common carrier continued until the goods were ready to be delivered to the succeeding carrier, and the latter had had a reasonable opportunity to take them away; that a "reasonable opportunity" means a sufficient length of time after the goods were ready for delivery, and during the hours when such goods are usually and in the ordinary course of business delivered and received, to examine them so far as to judge from their outward appearance whether they were in a proper condition, and to take them away; and that if, according to the usual course of business between defendant and the Southern Minnesota Railway Company, it was customary for the latter company to call once a day for freight, and to take it away, and if said company did so call on the Saturday preceding the fire, and at that time the goods in question, or any of them, were not unloaded from defendant's cars, or, if unloaded, were not ready for delivery according to the usual course of defendant's business, then defendant's liability as a common carrier still continued as to such goods.

The court refused instructions asked by defendant, to the effect, 1. "That if the goods had been unloaded into the defendant's warehouse at La Crosse, at the end of its route, according to the usual course of business, and while in said warehouse were consumed without defendant's fault, then plaintiff

could not recover in this action." 2. "That if the goods had been transferred to La Crosse at the end of defendant's route, and there unloaded into its warehouse, from which the next carrier was in the habit of taking such goods, according to the usual course of business, without notice or request, and if said goods were ready for the next carrier at the time they were consumed without defendant's fault, then plaintiff could not recover." 6. "That in the eye of the law the Southern Minnesota R. R. Co. was plaintiff's agent for receiving and carrying forward the goods, and defendant was not liable for any default or negligence of said company." 7. "That after notice to the next succeeding carrier of the arrival and unloading of the goods, and their deposit in the place where goods were usually received by the succeeding carrier, the transit was at an end, and defendant's liability as carrier ceased."

Verdict and judgment for the plaintiff; and defendant appealed.

*John W. Cary,* for appellant, cited 2 Redf. on R. W., p. 11, § 162, note 9, and pp. 13–18, 35, 36; 1 Parsons on Con., 619, 620, 663, 664, 686, 687, and cases cited in note; *Van Santvoord v. St. John,* 6 Hill, 157; *Peet v. Ch. & N. W. R. W. Co.,* 19 Wis., 118; *Wood v. Mil. & St. P. R. W. Co.,* 27 id., 541; Story on Con., §§ 759, 759 b, 759c; Angell on Carriers, §§ 75, 301–307; Edwards on Bailm., 515, 524; *Denny v. R. R. Co.,* 13 Gray, 481–487; 4 Allen, 520–523; *Union Co. v. Hurt,* 30 Ga., 798; *Jenneson v. R. R. Co.,* 4 Am. Law Reg., O. S., 234, and cases cited; *Garside v. Trent and Mersey Nav. Co.,* 4 Term, 581, quoted with approval in 2 Redf., 64; *Norway Plains Co. v. B. & M. R. W. Co.,* 1 Gray, 263; *Thomas v. R. R. Co.,* 10 Met., 472; *Shenk v. S. P. Co.,* 60 Pa. St., 109; *McCarty v. R. R. Co.,* 6 Casey, 247; *Bansemer v. R. R. Co.,* 25 Ind., 434; *R. R. Co. v. McCool,* 26 id., 140; *Richards v. R. R. Co.,* 20 Ill., 404; *Porter v. R. R. Co.,* id., 407; *Davis v. R. R. Co.,* id., 412; *C. & A. R. R. Co. v. Scott,* 42 id., 132; *Francis v. R. R. Co.,* 25 Iowa, 60; *Mich. Cent. R. R. Co. v. Hale,* 6 Mich., 243; opinion

of CAMPBELL, C. J., in *McMillan v. R. R. Co.*, 16 id., 128; *Goold v. Chapin*, 20 N. Y., 259; 9 Barr, 144; 18 Iowa, 555; 11 Rich. Law, 337.   To the point that the second carrier was plaintiff's agent for receiving and carrying forward the goods, counsel cited *Schneider v. Evans*, 25 Wis., 241; *Wood v. Mil. & St. P. R. W. Co.*, 27 Wis., 541.

*Jenkins & Elliott*, for respondent, contended that the contract of the defendant, as to each lot of goods in dispute, was a *through* contract to Lanesboro, Minn., citing *Wahl v. Holt*, 26 Wis., 703; *Wilcox v. Parmelee*, 3 Sandf., 610; *Schroeder v. Hudson River R. R.*, 5 Duer, 55; *Buckland v. Adams Exp. Co.*, 97 Mass., 124.   They also contended that instead of relaxing the rule laid down in *Wood v. M. & St. P. Railway Co.*, 27 Wis., 541, it would be better to adopt the English rule as stated in *Muschamp v. L. & P. Railway*, 8 M. & W., 421, (2 Redf. on R. W., 75; *Nashua Lock Co. v. R. R. Co.*, 10 Am. Law Reg., N. S., and cases there cited), or at least to hold that the first carrier shall be liable as such, not only until the second has a reasonable opportunity to take the goods after they are in readiness, but until the first carrier, after the lapse of such reasonable time, has done some further act, separating the goods from those which are in transit, and putting them in storage.   *Mills v. Mich. Cent. R. R. Co.*, 45 N. Y., 622.

DIXON, C. J.   The learned counsel for the railway company asked permission at the bar, and the request was also joined in by counsel for the plaintiff, and leave was granted by the court, to re-argue the point decided in *Wood v. Railway Co.*, 27 Wis., 541, that where a common carrier conveys goods over only a portion of the route between the places of shipment and consignment, and holds them for delivery to some connecting carrier, the liability of the former as a common carrier continues until the goods are ready for delivery to the connecting carrier, and until the latter has had a reasonable time to take them away.   The "reasonable time," as there defined, was said to be

the earliest practicable time after the first carrier is ready to deliver, and is not measured by any peculiar circumstances in the condition of the second carrier requiring for its convenience that it should have a longer time.

Against the rule thus laid down, counsel on both sides in this case, as well as in some others involving the same question, most earnestly and vehemently protest, on account of the great uncertainty which must exist in its application to particular cases, and the likelihood of most tedious and expensive litigation which may follow in determining the rights of the owner of the goods, or the liability of the carrier, in almost every such case of loss. Counsel say, and say truly, that the inquiries of fact upon which the issue is made to depend, are of the most equivocal, perplexing and doubtful character, such as the parties will seldom agree upon, and such as will often divide the jury. They say that the expression, "reasonable time," is suggestive of the most embarrassing vagueness and uncertainty, opening wide the door to speculation and diversity of opinion in many cases; and that where one jury may say "yes," another, upon the very same state of facts, may answer "no," whilst a third may fail to agree altogether. Counsel cry out against this uncertainty, these doubts and embarrassments, and pray that whatever rule may be established, it may be a certain one, freed from these difficulties, and plain and easy of application. It is equally argued on both sides that the rule contended against is a departure from the true principles or policy of the law in such cases.

For the railway company the position assumed is, that its liability as carrier should cease whenever the goods are removed from its cars, and thenceforth it should be responsible to the owner for the property in its possession only in the character or capacity of a warehouseman or a depositary for hire. This is the rule in some of the states, and it has the advantage of that convenience and certainty of application for which counsel contend.

On the other hand, the position taken by counsel for the plaintiff is, that the removal and deposit of the goods in the warehouse preparatory to a delivery of them to the next carrier and for that purpose, is a part, and a necessary and indispensable part, according to the method of transportation and conveyance adopted and in use by railway companies and some other carriers, of the act of carriage itself; and that the liability of the last carrier as such, does not, under ordinary circumstances, cease until the goods have been actually delivered to, or placed in the custody and control or under the management and direction of the next carrier, so that the liability of a common carrier will have attached to the latter in case of the loss or destruction of the goods from any cause not exempting a common carrier from responsibility.    The position assumed in this behalf is, that the warehousing, so called, of goods thus in transit over different connecting routes, and which have not reached their place of destination or ultimate delivery, is merely incidental and subsidiary to the principal or main act of carriage, and a part of that act.    With respect to goods and property so on the way or going forward, the position, except under extraordinary or peculiar circumstances, recognizes no such thing as an interruption of a common carrier's liability, or of the protection afforded by that principle of the common law, so far as it respects the rights and remedies of the shipper or owner of the goods.    The position rejects entirely the doctrine, as to goods thus in the ordinary course of transit, that the common carrier in whose possession they are, may be now a common carrier and now only a warehouseman, according as the goods may be in motion in the cars or other vehicles or at rest upon a platform or in a depot or other place of temporary deposit.    It ignores entirely the assumption that, as to such goods and under such circumstances, the carrier can become a mere warehouseman, and liable only in that capacity to the shipper or owner, but declares that as to him the character or capacity of common carrier remains un-

charged with the possession of the goods, and until the same has been parted with by delivery to the next carrier. It regards depots and other buildings erected by the carrier, in which goods passing over the route are thus temporarily housed and protected from loss or damage by the elements as well as from the depredations of thieves and trespassers, as structures for convenience merely of the carrier himself, or not only convenient but essential to his business as a carrier during these pauses or rests made necessary by the system or mode of transportation which now almost universally prevails. It looks upon the warehouses and other buildings and places for storage merely as concomitants of the carrying business, ancillary and subservient thereto, but not as giving the carrier any distinct or separate character or business with respect to the goods so *en route* and in his possession and custody. It holds the warehouses of railway companies as structures designed to facilitate their business as carriers, by enabling the companies to carry out a system of separation, classification and delivery of goods received and carried, without which there would be no possibility of conducting their carrying business with the requisite precision and dispatch, or with any ease or profit.

Such are some of the views, briefly expressed and in my own language, which were urged by the learned counsel for the plaintiff, and such is the rule they would have the court sanction and adopt as the true and sound one in the law. It will be seen, too, that this rule has the same advantage of certainty and of convenience and clearness of application as that propounded and urged by counsel for the railway company.

I must say that I was very forcibly impressed by the arguments on both sides made at the bar, and such was the interest awakened in my mind that I at once gave the question an attentive and thorough examination, as much so, at least, as my time and capacity and the means at hand would permit. I came to the conclusion with counsel on both sides, that the rule of *Wood v. The Railway Company* could not and ought not

to stand, and that, as is most apt to be the case with middle grounds, often of doubtful policy and more often of dangerous tendency to sound principle, it failed in that clearness, certainty and convenience of application which the true principles of law require, and which are indispensable to the facility, safety and confidence of business transactions and of all commercial dealings and traffic constantly taking place over these great connecting routes of trade and communication. I became satisfied that, however, in the various and multiplied turns and complications of human affairs and relations, doubts and uncertainties inhere in and are inseparable from some legal rules, this was a case where they ought not to exist. The rule here, whatever it is, should be definite and certain in its application to all ordinary cases. There is no inherent difficulty in making it so, and the immense interests of the carrying business of the country, as well as of trade and commerce, peremptorily demand it. In the multitude and importance of cases so frequently arising, and which must ever thus continue, parties cannot be delayed to palter and trifle, as it were, in a delusive struggle for their rights over nice distinctions of fact and fine shades of difference, which fade away into regions of obscurity and finally of total darkness, and which facts, when settled, settle nothing after all but the particular case, leaving all others to be contested and litigated over and over again upon the very same grounds. I agree, therefore, with counsel on both sides, when they say that the expenses attending this course of decision, or the litigation which must follow, would be enormous, and that this alone, without considering the other inconveniences and mischiefs to which allusion has been made, is sufficient to condemn the rule. I agree that any rule unnecessarily fraught with such evil consequences is a bad one, and should be abandoned.

This is another of the numerous actions springing from the same unfortunate destruction of property as in *Wood v. The Railway Company.* The question comes up, therefore, which of the two rules propounded by counsel is the correct one and

ought to be adopted. For I conceive that I must in this case act upon and determine the rights and liabilities of the parties according to one or the other. In *Wood v. The Railway Company*, I assented to the rule laid down, not because I thought there was or could be, under ordinary circumstances, a pause or cessation in the common carrier liability with respect to the consignee or owner of the goods, during such temporary rest and storage of them preparatory to delivery to the next carrier, and during which also there would spring up and exist only a warehouseman's or forwarder's liability; but I did so on the supposition that the carrier's liability was to be continuous until the goods reached their place of final destination, where they were to be delivered to the consignee or owner. My supposition and view was, that the liability of the next carrier in the connecting line or route, *as a carrier*, would attach the very moment that of the last carrier, as such, would cease. In other words, I considered that whenever the liability of the last carrier, as such, ceased by lapse of reasonable time for the next carrier to receive and carry forward the goods according to the usual course of transportation and business after the goods were ready for delivery to him, the liability of the latter as a carrier attached, and he must be held to respond to the consignee or owner for their value in case of the subsequent loss or destruction of them. Such was my consideration of the question, and I placed it, not upon the ground that the next carrier had become or was in any sense the agent of the consignee, owner or shipper of the goods, and in that character responsible to him for not receiving and carrying them forward, but upon the ground of the usage and custom among carriers so related to and connected with each other in the business of transportation that their lines, or routes, though separately owned and managed, yet running into and uniting one with another, in practical operation and effect constitute one continuous route. The usage among carriers so connected, or joining their routes, in the absence of special contract or special notice to the contrary, is not only well

known in commercial and business circles, but is also known and acted upon by the courts. Courts recognize and give force and effect to it. *Schneider v. Evans*, 25 Wis., 241 (3 Am. R., 56), and cases there cited. That usage, now become universal or very nearly so, is for the railway company, receiving the goods destined for a place beyond the terminus of its route, to transport them over its own road and then deliver them to the next company or carrier in the line of transit, collecting from the latter its own charges for freight and transportation, whereupon the latter becomes invested with a lien upon the goods for the charges so advanced in addition to his rates or charges for the transportation and delivery to the next succeeding carrier, who, in turn, advances the charges of the two that have preceded him, and thus the process continues and is repeated until the goods have reached their place of destination and are in the hands of the last carrier, ready for delivery to the consignee or owner, subject to payment to such carrier of the accumulated charges of all the preceding carriers over whose routes they have been transported.

Now it was upon this well known custom and usage, amounting as it does to an implied contract or promise on the part of each succeeding carrier to pay back charges and receive and carry forward the goods brought to it by the preceding one, that I relied as constituting the true ground of action or liability against the succeeding carrier, in case he unreasonably failed to receive and carry forward the goods according to his implied contract or obligation, and as he had held himself out as ready and willing and promising to do. That contract or obligation, I then thought and still think, created a liability on his part co-extensive with and similar in nature to his liability as a common carrier, in case he neglected or refused, in proper time and according to the usual course of business, to receive the goods, and they were afterwards, and before coming to his possession, lost or destroyed. I then looked upon his liability, and still do, as being in extent the same as if the loss or des-

truction had been of the goods in his custody and possession as a common carrier. It was to my mind like the case of goods delivered to a carrier for transportation, and which were destroyed before the transit commenced. By the law of common carriers, their liability is fixed on receipt of the goods, and if they are lost in the warehouse of the carrier or elsewhere before the carriage commences, the carrier must respond, unless the loss was caused by a force superior to and beyond human agency and foresight, or by the public enemy, the *onus* of showing which is upon the carrier. *Blossom v. Griffiin*, 13 N. Y., 569; *Ladue v. Griffith*, 25 N. Y., 364. I regarded the goods, when separated and set apart in the accustomed place in the warehouse, and ready for delivery by the preceding carrier, and after a reasonable time had elapsed for the succeeding one to receive them, and when, in the due course of business, he should have done so, as being *pro hac vice*, if need be, in the warehouse of the latter awaiting transportation by him, or if necessary for the purpose of the remedy, constructively in his possession as a common carrier.

Such were the views which I then entertained, and I have as yet discovered no good reason for changing them. I then thought, and still think, that the loss, if possible, should be made to fall on the carrier in fault, or him who appeared most so, and it was for this reason I assented to the rule that the last carrier should be held responsible, as such, only until a reasonable time had elapsed for the next carrier to receive the goods, and not after that time. I was not disposed to make the last carrier responsible, without remedy, for the faults and delinquencies of the next, over whose movements and conduct he had no control. It was upon this principle I yielded assent to the rule, and it did not occur to me then that there was any better or more satisfactory solution of the difficulty.

It will be seen, hence, that I did not assent to the rule on the ground that the next carrier was the agent of the owner for the purpose of receiving such delivery, which seems quite impossi-

ble. The agency, in such cases, springs from the possession of the goods in the hands of a carrier, marked for some place beyond the terminus of its own route. Such carrier, from the fact of possession, becomes the agent of the owner for the purpose of making or tendering delivery of the goods to the next in the proper line of transit. By the usage of the business in which he is engaged, he assumes to do that when he receives the goods, and it may properly enough be said to constitute a part of his undertaking as carrier. The decision in *Schneider v. Evans* means just this and nothing more, and Mr. Justice LYON himself now concedes the error in the application. Had particular attention been directed to it at the time, it would undoubtedly have been corrected.

But the difficulties in the way of applying the rule are manifest and manifold. It casts upon the owner of the goods the burden and the risks of settling the rights and liabilities as between the different carriers. It imposes upon him a task which in nearly every case he will have no adequate or proper means of performing. He is often a stranger, residing in a distant part of the country, and wholly unacquainted with the facts. Actual knowledge of the facts and of the particular system or mode of transacting the business, rests only with the agents and employees of the carriers; and, being adversely interested, it is not to be expected they will be free to communicate what they may know. Indeed it must be presumed that they will refuse to give information of facts which will charge their employers, if they know such facts.

And a result of the rule may be to deprive the owner of all remedy for the loss or destruction of his property, after he has mulcted himself in two heavy bills of costs. He may come out like Mr. Bromley with his portmanteau, with no right of action against either carrier. *Midland Railway Co. v. Bromley*, 8 J. Scott, 372 [84 E. C. L., 372, 382, note (a)]. A verdict and judgment in an action against the last carrier settles nothing in a suit against the next. In an action against the last the jury

may find that a reasonable time had elapsed, and in the suit against the next they may find the reverse; and so the owner falls between two fires.

And again the question arises, What is the proper way out of these difficulties? I have examined not only the cases cited but very many others, and have pondered the question well, at least as well as I am capable of doing, as between the two rules laid down by counsel, neither of which is unsupported by authority; and my conclusion is, that the rule contended for by counsel for the plaintiff is the correct and true one. In coming to this conclusion I have anxiously endeavored to recognize a rule, which, while it shall not prove injurious and embarrassing to the great commercial interests of the country, shall, at the same time, protect the interests of the carriers, or, at all events, be of so much aid and service to them that the proprietors of that interest shall know and understand with clearness and certainty the full extent of their obligations to the public.

I think, in the absence of special contract or agreement to the contrary, the true policy of the law, now as much as ever and even more, is to adhere to the strict rules of liability on the part of common carriers established by the common law. I believe the safety and protection of the trade and commerce of the country demand this, and I believe also that, by the feeling of confidence and security thus created and given, the great carrying interests of the country will be likewise ultimately benefited, and their prosperity promoted. I believe the true policy of the law consists with giving the owner a certain, sure and ample remedy in case of the loss or destruction of his goods while in the hands of the carrier; and hence I reject the rule contended for by counsel for the railway company, because it is calculated to give the owner anything but such remedy. To admit the change in capacity and liability from carrier to warehouseman at every pause in the carriage over our long connected routes, would in practice and effect be to say to the owner that he has no remedy. To recover as against a warehouseman, the burden

would be upon the owner to establish the negligence. He must aver and prove that his goods were negligently lost or destroyed, which, except in very rare instances, would be an utter impossibility, even though the fact of negligence might exist. It would be better far to inform him that he is without relief, than to deceive him with a remedy like this.

To admit such interruptions of the liability of the carrier would make clear the way for the grossest frauds and impositions, with no means of protection and no power of discovery on the part of the owner. He is always absent. He does not go with his goods, and cannot be permitted to do so. He must trust them absolutely and exclusively to the keeping of the carrier. Whether they were lost or destroyed when in motion or on the way, or while in a warehouse, he could not tell, and it would generally be a secret past his finding out. He would be wholly in the power and at the mercy of the carrier; and if the carrier said they were destroyed in a burning warehouse or depot, he must abandon all claim. This would be placing too great power in the hands, as well as too great temptations in the way of carriers.

"It is well settled in this state," says Mr. Commissioner EARL, in delivering the opinon of the commission of appeals in *Fenner v. Railroad Co.*, 44 N. Y., 505 (4 Am. R., 710), "that an intermediate carrier, one who receives goods to be transported over his route, and thence by other carriers to their place of destination, generally remains liable as a common carrier until he has delivered the goods to the next carrier. It was deemed wise policy that the principles of the common law should be so expounded and applied, that the liability of one carrier should continue until that of the next carrier commenced." The learned commissioner cites *Miller v. Steam Navigation Co.*, 10 N. Y., 431; *Gould v. Chapin*, 20 id., 266; *Ladue v. Griffith*, 25 id., 364; and *McDonald v. Western Railroad Corporation*, 34 id., 497; and then proceeds with a quotation of the language of Chief Judge JOHNSON in *Gould v. Chapin*,

as follows: "No owner can be supposed to have an agent to superintend each transhipment of his goods, in the course of a long line of transportation; and if the responsibility of each carrier is not continued until delivery in fact to the next carrier, or at least until the first carrier, by some act clearly indicating his purpose, terminates his relation as carrier, we shall greatly diminish the security and convenience of those whose property is necessarily abandoned to others, with no safeguards save those which the rules of law afford."

And next the commissioner quotes the language of Judge SMITH in *McDonald v. The Western Railroad Corporation*, which is this: "The owner loses sight of his goods when he delivers them to the first carrier, and has no means of learning their whereabouts till he or the consignee is informed of their arrival at the place of destination. At each successive point of transfer from one carrier to another, they are liable to be placed in warehouses; there, perhaps, to be delayed by the accumulation of freight or other causes, and exposed to loss by fire or theft, without fault on the part of the carrier or his agents. Superadded to these risks, are the dangers of loss by collision, quite as imminent while the goods are thus stored at some point unknown to the owner as while they are in actual transit. As a general rule, the storing under such circumstances should be held to be a mere accessory to the transportation, and the goods should be under the protection of the rule which makes the carrier liable as an insurer, from the time the owner transfers their possession to the first carrier till they are delivered at the end of the route."

And here it occurs to me to observe, that among the great number of such cases which have arisen and been adjudicated by the courts of New York, not one has yet been presented where the intermediate carrier has been exonerated from liability as a carrier for goods lost or destroyed while in store or on deposit by such carrier. The case of *Mills v. Railroad Co.*, 45 N. Y., 672, cited by counsel for the plaintiff in this action,

would seem to have been a pretty strong one for declaring an exception, but yet the court refused. The case of an *adjudicated* exception is yet to come, for thus far the doctrine rests upon mere suggestions or hints, vaguely thrown out, and nothing more.

And the case of *Nashua Lock Co. v. Railroad Co.*, 48 N. H., 339 (2 Am. R., 242), is a most elaborate and powerfully reasoned one, many of the arguments and views of which very strongly favor my conclusion. It contains a review and examination of most of the leading authorities, English and American, and a statement of the doctrines of the courts on both sides of the Atlantic. I must say that I think Mr. Chief Justice PERLEY performed a very great and valuable service, both for the profession and for the law, when he wrote that opinion.

And the case of *Barter v. Wheeler*, 49 N. H., 9, is another case most elaborately and well considered, as is the manner of that court, which also favors my views. I need only refer to these two last cases for a full and ample vindication of the principles by which I think the present one ought to be governed.

In England, the question presented in this case has never, to my knowledge, been considered, since, under the rule in *Muschamp's Case*, 8 M. & W., 421, it could not well arise. The first carrier there is liable, as such, for the safety of the goods throughout the transit and until they are delivered at the place of destination, which is, of course, a sufficient protection of the rights of the owner or consignee. The English rule has also, I believe, been applied in Illinois.

Now, in the present case, I think the law should hold the carrier in whose possession the goods were destroyed, responsible to the owner or consignee for their value, as a carrier or insurer of the goods, leaving such carrier to seek his remedy against the next carrier in the route or line of transit, in case it was the fault of the latter that the goods were not removed in due time as regulated by the course of business and the usage

Conkey vs. The Milwaukee and St. Paul Railway Company.

and practice prevailing among carriers. In this way the burden of settling those hazardous and uncertain questions would be thrown upon the carriers themselves, where it belongs. They are the parties who know the facts, or have ample means of ascertaining what they are. In this way, also, multiplicity of actions would be saved, for, as between the carriers themselves, the controversy could be settled in one action. I have no doubt that upon the usage and custom above spoken of, or upon the implied contract or obligation growing out of it, one carrier may maintain his action against another under such circumstances.

As I have limited the rule which I regard as the true one, to ordinary cases, or those arising under ordinary circumstances, it may be proper, perhaps, that I should suggest what would seem to me to be an extraordinary one. I should say that in a case of a break or interruption in the line of transit or communication, as by storm, flood or earthquake, or by fact of war, rendering it impossible to send the goods forward, or making considerable delay in the transportation necessary, the carrier might store the goods and at once give notice to the consignee or owner, and thus absolve himself from liability as a carrier. Other cases of an extraordinary nature might also occur. I only suggest these.

I think the judgment should be affirmed.

COLE, J. I concur with the chief justice in the rule of law which gives the owner or consignee the continuous liability of a common carrier while the goods are in transit, and, in case of loss, gives him his action against the carrier having possession when the loss occurs; and therefore I think that the judgment must be affirmed.

LYON, J. I concur in the affirmance of the judgment of the circuit court, but am inclined to adhere to the doctrine asserted in the case of *Wood v. The Mil. & St. P. R. R. Co.*, 27 Wis., 541.

*By the Court.*—Judgment affirmed.