GEO. H. NORRIS, APPELLANT, VS. THE SAVANNAH, FLORIDA AND WESTERN RAILWAY COMPANY, APPELLEE.

1. Where the transportation of freight, perishable in its nature, is interrupted and delayed by a flood in a river which the track of the railroad crosses, and the freight decays, and there is no negligence on the part of the common carrier in taking care of the freight or otherwise, the loss is attributable to the flood as an act of God and the carrier is not liable.

2. That a similar flood had occurred once in each of the two preceding years, but the carrier had not, by changing the construction of its road or providing other means of crossing the river, avoided the detention, does not render him liable, such floods being, up to the time of the trial of the cause, otherwise unprecedented.

3. The mere failure to notify the consignor or consignee of the detention, held not to render the carrier liable; the freight being promptly delivered as soon as the subsidence of the waters rendered a continuance of the transportation and a delivery possible, and no negligence in taking care of the freight appearing, and there being no evidence to show that the damage sustained would have been diminished, or to what extent, if such notice had been given.

Appeal from the Circuit Court for Duval county.

The facts of the case are stated in the opinion.

*C. P. & J. C. Cooper* for Appellant.

The court below erred in refusing plaintiff's third and fourth charges and in giving defendant's fourth and fifth charges.

The charges all relate to the defence attempted to be made in this case by defendant, that the loss of these oranges was occasioned by the act of God.

Appellant insists that this defence was not made out for the following reasons, to wit: The flood claimed to be the *vis major* in this case was not the direct, proximate cause of the damage to these oranges, and this fact distinguishes this case from case of R. R. Co. vs. Reeves, 10th Wallace, 176, cited by counsel for appellee. Says Justice Miller in that case, " one of the instances always mentioned, &c., of loss by act of God is case of loss by flood and storm. Now when it is shown that the damage resulted from this cause *immediately* he is excused. * * * * If, after he has excused himself, &c., it is charged he contributed to loss by his negligence, proof must come from those who assert it and rely on it." In the Reeves case the water on the freight from the flood was the *immediate* cause of the damage, hence any charge of negligence, that not being the proximate cause of loss, must be proven by those asserting it.

In this case the flood did not touch the oranges; the immediate cause of this loss was decay arising from the oranges being kept for ten days longer than they ought to have been in a tightly sealed car. The question in this case is not whether defendant is excused from liability for this loss by the " act of God," for that does not touch or immediately relate to the damage, but whether it or its agents were justified in holding these oranges at Ludlow, just across from Cincinnati, for ten days in a sealed car without giving notice to consignee or consignor of their arrival or

detention, without seeking to save them by opening the car and taking them out, or re-shipping them to consignor.

Again, if it is held that this flood was the proximate, immediate cause of this damage, the further questions arise, can a railroad company excuse itself from liability for damage occasioned by detention arising from a rise of water, which has occurred the two years previous so as to create similar detentions? Where there is this annual recurring rise in the waters, appellant insists it is not that sudden, unexpected, overpowering element, which, if it causes damage, excuses the carrier from liability.

It is also shown by the testimony of C. W. Gerard that other freight and persons were being carried across the river, so that defendant's agents ought not to have waited to build tracks and bridges, but knowing this freight was perishable they should have taken it out of the car and shipped it over to Cincinnati, as the articles and people seen by Mr. Gerard were taken over. They waited to haul over this entire car, the oranges rotted and were a total loss.

Messrs. Axline & Markley received one car load of oranges during this time which witness, Brazier, says, "The car load of oranges delivered to us on the 8th were transferred across the Ohio river by Cincinnati, New Orleans and Texas Pacific R. R. Co. It is possible, although I do not think it probable, that they were brought over before the 6th of February, 1884." If it be true that this company, which was the connecting company transporting plaintiff's oranges, delivered other oranges after the 6th, the plaintiff of course had a right to have his moved across the river before the rising waters prevented.

The last and most important reason we urge against this defence is that neither consignor or consignee were noti-

fied of the arrival of these oranges at Ludlow, just across from Cincinnati, nor of their detention there.

Appellant urges that the *vis major* must be the immediate cause of the damage to constitute a defence, or put burden of proving negligence on plaintiff. 2 Redfield's Railways, (5th edition), six cases cited in note ; McGraw vs. B. & O. Co., 18 W. Va., 361-2 ; 1 Conn., 487 ; Packard vs. Taylor, 35 Ark., 402 ; 2 Hilt., 19 ; 54 Ill., 58.

These cases also decide, as we contend, that the defence that a loss is occasioned by the "act of God," cannot be sustained where the accident is in the nature of the rising of a river, which rose in each of the two preceding years so as to prevent travel across this very bridge ; just as loss from freezing by cold is not loss by "act of God;" cold comes regularly and must be provided against.

This company ought not to have undertaken to transport perishable fruit across the Ohio river in February when the snows create the freshets and rises in the river. If they did undertake to carry such freight they should be ready to meet such emergencies. 18 W. Va., 361-2 ; 1 Conn., 487.

Appellant urges as the main reason why in this case the defence that the loss was occasioned by "act of God" cannot be sustained is, that defendant or connecting company having the freight in charge at Ludlow, ought to have notified the consignee or consignor that the freight was just across from Cincinnati, and on account of rise in the river that was as near destination as freight could be brought, then consignor or consignee could have taken the oranges out at that point and sold them, or taken them to Chattanooga, or some town along the line of road on this side and disposed of them.

Notice to consignee should be given if shipment is not received on time, or there are unusual circumstances in

connection with the transportation and receipt of the freight. See 2 Redfield, R., page 71 and 77; Michigan Central R. R., vs. Wood, 2 Mich., 538; Rome R. R. Co. vs. Sullivan, 14 Ga., 277; 2 Parsons on Contracts, 188.

We think that the language of the U. S. Supreme Court in R. Co. vs. Manufacturing Company, 16 Wall, 308, applies here. "Had the shipper been informed of the serious hinderances, &c., it is fair to infer he would have given a different direction to his property, &c."

In this case at bar this was perishable property, oranges in a sealed car. Every sensible man must have known that they would rot and decay before that bridge could be built. The owners ought to have been given a chance to save what they could by notice of this arrival and unexpected delay. It is no answer to say, we can't tell that you could have done anything with the oranges if notice had been given. The shipper under the peculiar circumstances was entitled to the chance to try to save himself.

We think the rule correctly stated in case of Conkey vs. M. & L. & P. R. R. Co., 31 Wis., 619, speaking in reference to connecting company being unable by accident to deliver to next carrier. Says the court: "I should say that in case of a break or interruption in the transit or communication, as by storm, flood or earthquake, or by fact of war rendering it impossible to send the goods forward, or making considerable delay in the transportation necessary, the carrier might store the goods and at once give notice to the consignee or owner and thus absolve himself from liability as a carrier." This is certainly the law that should apply in case of perishable articles arriving just across the river from destination and certain to be destroyed by delay, which from its nature defendant's agents saw must last for several days.

The goods had come as near destination as they could

then be gotten, extraordinary circumstances intervene and they cannot be carried to usual landing place, goods are of perishable nature, are shut up in close car, must certainly decay if kept there—now, under these circumstances, notice was the duty of the railroad officials, and want of it was gross negligence, for practically it was the way to save the fruit.

We contend that the necessity for notice of this delay to consignee or consignor is the law of the peculiar circumstances of this case, whether there be a fixed rule of law on the subject or not; no precisely similar case can be found.

It is quite frequently the case that goods about to be lost from decay in transitu are sold by the forwarder to save total loss to the owner, and this is justified in the decisions; so here we say a chance to the owner or consignee to sell before loss was the proper course for defendant's agents at Ludlow.

The verdict is contrary to the evidence as construed under proper view of the law of this case; it is also contrary to the law, as we insist it is on the defence of terminal liability and loss from delay: hence the motion for new trial should have been granted, and its refusal was error.

MR. JUSTICE RANEY delivered the opinion of the court:

The appellant, who was plaintiff in the Circuit Court, delivered to the appellee at Jacksonville, in this State, February 2d, 1884, three hundred and one boxes of oranges destined for Cincinnati, Ohio, and consigned to the Grange Supply Company. The oranges did not reach Cincinnati till the fifteenth day of the month, on which day, or on that and the next day, they were delivered to the consignee, but in a condition of such decay that only about eighty boxes could be used or sold. The appellant sued the railroad

company and there was a trial by jury, resulting in a verdict and judgment for the latter.

The only question we shall consider is whether the loss sustained by the appellant is attributable to the act of God.

The defendant company's section of the railroad route over which the oranges were transported extends from Jacksonville, Fla., to Jesup, in Georgia, where it connects with the road of the East Tennessee, Virginia and Georgia R. R. Company, extending to Chattanooga, Tennessee, from which point the road operated by the Cincinnati, New Orleans and Texas Pacific Railway Company, completes the route to Cincinnati. The oranges reached Jesup between two and three o'clock A. M. of February 3d, where they were delivered to the E. T., V. & Ga. Company at about three o'clock, and they left there the same morning about 7 o'clock by passenger train for Chattanooga, where they were received on the 5th of the month by the C., N. O. & T. P. Ry. Company. They reached Ludlow, a station on the latter road, one mile south from Cincinnati, and 335 miles north from Chattanooga on the next day, but the precise time of the day cannot, the record states, be given because of the loss or destruction of the railroad company's records. They did not reach Cincinnati however until the 15th day of the month. They were shipped at Jacksonville in a through car for Cincinnati, which car was billed as such, and " sealed with Jacksonville seals," and in this car they remained till taken from it for delivery to the consignees in Cincinnati, it not having been opened until about the time of such delivery. The route the oranges were transported over was the most direct railway route between Jacksonville and Cincinnati, and the time usually taken in transporting a through car over it is "four or five days," or " about five days," and from Chattanooga to Cincinnati

the time is from 22 to 24 hours. There was no unusual de-
lay, but the car came through on time, until it reached Lud-
low, where it remained from the 6th to the 15th of Febru-
ary.

This detention at Ludlow was occasioned by a flood in
the Ohio river which obstructed entrance into Cincinnati,
and early in the morning of February 6th washed out and
destroyed a large portion of the Cincinnati end of the rail-
road bridge over the river, or the trestle at such end, it be-
ing under from 8 to 20 feet of water, and prevented any re-
pair of it until the 24th day of the month, when business
was resumed over the bridge. This break could not be re-
paired so that engines could pass over it till the 24th. The
water rose to an unprecedented height, so high as to stop
all transit of trains, it rising over 74 feet, and not subsiding
till the 24th, so that the passage of trains could be resumed.
Trains can be run if the water does not rise higher than
53 feet. The flood was the highest ever known, was very
destructive to property, and completely obstructed all access
to the city by rail from the south and from the north, ex-
cept by one small narrow-gauge road. It submerged a
large portion of the business part of the city, through which
the railroads run, including the road of the C., N. O. & T.
P. Company. The Ohio river has never risen so as to ob-
struct travel over the C., N. O. & T. P. Company's bridge,
except two or three times; once, it may be, in 1882, once
in 1883, and in the instance stated in 1884, the rise in each
succeeding year being higher than before. The bridge is
iron and of good quality, and the road way over it is one
hundred and ten feet above low water mark. The water
rose between the 5th and 15th "to 74 feet and some
inches." The river is subject to the same variations as any
other river, and is rising and falling at all seasons of the
year, but not such rises as those of 1882, 1883 and 1884.

The bridge has not been changed, and a similar rise in the river would occasion the same detention on the road and all other roads to Cincinnati. One witness says it was absolutely impossible to deliver the oranges across the river from Ludlow by boats; that men could not have been hired for $300, or any sum, to undertake the risk of carrying freight across in boats; that it would have been very dangerous, on account of the high water and swift current, and that there was no landing on the Ludlow side for boats. The car was taken from Ludlow as soon as it was possible to do so, and it was the first car of freight taken over the bridge from Ludlow and delivered to any point in Cincinnati. The C., N. O. & T. P. Co., to render delivery of freight possible, built a platform at the approach to the bridge, where the trestle was washed away, by February 5th, which, according to the testimony, was the earliest possible moment at which it could have been completed, and had the car brought over the bridge to this platform at once. At this time the car could not have been taken by the regular line of road into the city of Cincinnati, as there was from ten to twenty feet of water over the two miles of track necessary to be traversed. The railroad company hired boats to deliver the oranges on dry land to the consignees, who had wagons ready to receive them. These boats, through means of which the delivery was effected, were rough scows or barges which were filled with the oranges and poled through the streets near to high ground on Richmond street, and there the oranges were delivered to teams which were drawn out into the waters to receive them.

. The testimony shows that some other oranges were delivered in the city soon after the sixth of February, but that they were brought over the bridge before the fifth and an-

terior to the wash-out, and the delay in their delivery was attributable to the confusion incident to the flood.

An extraordinary flood, such as that of 1884, described in the testimony, is the act of God, and injury caused to the appellant by it solely is not a ground of action against the common carrier. Where the happening of the injury has been contributed to by the carrier, or would not have resulted from the act of God but for the carrier's negligence or departure from the line of his duty, he is not protected. What is such a contribution to the injury or such negligence or departure from duty by the carrier as will deprive him of the protection which the act of God would otherwise give him, is a point upon which there is a conflict of authority. From the evidence in this case we can see no negligence or departure from duty by the appellee contributing to the occurrence of the injury. There was no delay in transporting the oranges till they reached Ludlow, where they were detained by the flood, and it is clear that they were delivered to the consignees at their place of destination just as soon as the subsidence of the waters would permit an active diligence to deliver. The only grounds upon which negligence appears to have been alleged in the Circuit Court, or is charged here, are: 1st, that as there had been risings of the Ohio river before the one pleaded, it was " the duty of the railroad company to have used reasonable diligence and care in protecting the goods from decay by providing against such emergencies, either by constructing its road to meet the same or by providing other means of transportation across said river," to avoid the detention. 2d, that it was the duty of the company to have notified the plaintiff or the consignee of the detention of the oranges at Ludlow on their arrival there, and having failed to do so, it is not released by the flood from liability. We do not think the rises of the Ohio in

1882 and 1883 deprive the rise of 1884 of its character as an act of God, or required the appellee to have reconstructed its road or provided other means of transportation across the river to meet such emergency. The testimony shows that up to the time the witnesses in the case testified these rises were wholly unprecedented.

The mere omission to give the notice indicated by the second charge of negligence does not render the appellee liable. Whether or not a storing of the freight and notification thereof to the owner will relieve a common carrier from his liability *as such*, pending the interruption, according to what is said *arguendo* by Judge Dixon, in Conkey vs. M. & St. R. R. Co., 31 Wis., 637, (but is not a point decided in that case) we are not called upon to say. We have seen no authority to the effect that in case of a delay caused by the act of God a simple failure to notify the consignor or consignee of the detention is, of itself, an act of negligence, rendering the carrier liable for the consequences of such delay. There is no contention that the oranges were not properly taken care of pending the interruption. Bennett vs. Bryan & Co., 38 Miss., 17 ; Hutchinson on Carriers, §268. Nor does the testimony show even that had such notice been given the damage sustained by the plaintiff would have been lessened, or to what extent. What the plaintiff might have done, or what the result of his action upon the quantity of the damage would have been, cannot be assumed, even if it can be held that in such a case the damage sustained is attibutable to the mere failure to give notice.

Upon the law and evidence in this case, the injury, in our opinion, is attributable to the act of God, and the judgment should be affirmed. Bud vs. Spaulding, 30 N. Y., 630 ; R. R. Co. vs. Reeves, 10 Wallace, 176 ; Maslin vs.

B. & O. R. R. Co., 14 W. Va., 180 ; Williams vs. Grant, 1 Conn., 487 ; Hall & Co. vs. Renfro, 3 Met., (Ky.) 50 ; Redfield on Railways, vol. 2, p. 6 ; Friend vs. Woods, 6 Gratt., 189.

Judgment affirmed.